[No. 31570-0-II.   Division Two.   July 19, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT WESLEY CASSEL, *Appellant*.

*Lisa E. Tabbut*, for appellant.

*Arthur D. Curtis, Prosecuting Attorney*, and *Kelli E. Osler, Deputy*, for respondent.

¶1 VAN DEREN, J. — Robert W. Cassel appeals his conviction for premeditated first degree murder, arguing that (1) the evidence was insufficient to support the jury's guilty verdict, (2) the trial court improperly admitted hearsay testimony, and (3) the trial court erred in including out-of-state convictions in calculating Cassel's offender score. In his Statement of Additional Grounds for Review (SAG),[1]

---

[1] RAP 10.10.

Cassel argues (1) ineffective assistance of counsel, (2) police and prosecutorial misconduct, (3) improper surprise witness testimony, (4) trial court error in refusing to dismiss a sleepy juror, and (5) insufficiency of the evidence. We affirm the conviction and remand for resentencing.

## FACTS

¶2 Kathleen McCullough made her living by collecting tithes and appearing at various churches as a traveling minister. It was not unusual for her to live at various motels when she provided ministerial services away from her home in Klamath Falls, Oregon.

¶3 McCullough grew up poor and experienced financial difficulties as an adult, but she would scrimp and save to buy jewelry.

¶4 In March 1999, Robert Cassel called Steven Preller, McCullough's close friend, collect from the Clark County jail in Washington. McCullough had known Cassel for approximately six or seven years. Cassel asked for McCullough's phone number, which Preller provided.

¶5 Within days, McCullough left her home in Klamath Falls and traveled to Clark County, Washington to post bail for Cassel, who was in jail on pending robbery charges. While in the vicinity of the courthouse, McCullough spoke briefly with a woman named Beverly Brown.

¶6 Brown noticed that McCullough seemed distressed and began talking to her. McCullough told Brown that she had come to bail Cassel out of jail after receiving a message from God that Cassel would "rescue" her. Report of Proceedings (RP) at 10-A 383. But McCullough told Brown that she was unsure if she had done the right thing. Shortly thereafter, Brown saw McCullough with Cassel and, at that point, McCullough appeared unemotional and calm.[2]

¶7 On March 26, McCullough and Cassel rented a room at the Comfort Inn in Vancouver, Washington with a

---

[2] Brown testified to these facts at trial.

check-out date of March 29. McCullough seemed happy and told lodge staff about her plans to marry Cassel. Though McCullough registered in person when she arrived, she did not sign any paperwork at the end of her stay.

¶8 McCullough had dinner with Preller at a Mexican restaurant in Camas, Washington, on March 27. At the end of the meal, McCullough purchased dinner to take to Cassel. Later that evening or early the next morning, Preller received a call from McCullough. According to Preller, she seemed upset. This was the last time they spoke.

¶9 On March 28, Cassel used McCullough's credit card to check into the Heathman Lodge in Vancouver, Washington. Cassel told lodge staff that his wife was in the car and not feeling well. On March 29, a hotel employee asked Cassel about his wife. Cassel responded that she had been delayed out of town at a trade show and was due in soon. The hotel employees never saw McCullough.

¶10 On March 29, two days after Preller last saw McCullough, Cassel drove McCullough's car, a maroon Grand Am, to Preller's Washington home. Cassel told Preller that he had purchased a new Ford Taurus for McCullough and that she would be coming by shortly to show it to Preller. But McCullough never arrived, and the police were later unable to find any record that Cassel had recently purchased a vehicle.

¶11 Also on March 29, Cassel went to a convenience store in Camas and used one of McCullough's credit cards to purchase various items, including a sleeping bag, a Coleman stove, cleaning agent, a tarp, and food. That same day, he pawned her jewelry. Cassel also attempted to remove cash from McCullough's bank accounts on March 31, April 1, and April 2.

¶12 On April 5, McCullough's daughter, Kimberly Bair, reported her mother missing. Vancouver police opened a missing person investigation.

¶13 On April 19, Vancouver police located McCullough's Grand Am in a Portland, Oregon neighborhood, near

Cassel's son's residence. Using a warrant, they seized and searched the car, which revealed a small amount of Cassel's blood in the driver's area and a small quantity of McCullough's blood on the passenger door. Police also discovered some fern-like plant matter on the floor of McCullough's Grand Am. At trial, an expert testified that the plants were the same or similar to those growing in the area where police located a body later identified as McCullough's.

¶14 On May 11, the police located McCullough's body on a rural, unpaved road in Washington, near Cassel's residence. The body was badly decomposed, but Dr. Fred Sorenson, a specialist in forensic dentistry, was able to positively identify the body as McCullough. The autopsy showed that McCullough died of blunt head trauma and that her injury was consistent with at least eight or nine blows to the back of her head. The blows could have been inflicted with a heavy, blunt object, such as a rock.

¶15 In July, police interviewed Cassel. During the interview, Cassel described McCullough as a "false prophet." RP 12 at 867. The court admitted this statement at trial.

¶16 At trial, Bair testified about various items of jewelry that had belonged to her mother. She told the jury that her mother was attached to her jewelry, considered some of the pieces to be heirlooms, and would not permit others to wear them. She further testified that she had never seen her mother bleeding in her Grand Am and that she was not aware of any injuries on her mother's body at the time her mother left for Washington.

¶17 The State charged Cassel with premeditated first degree murder pursuant to RCW 9A.32.030(1)(a) or, alternatively, murder while committing or attempting to commit the crime of robbery in the first or second degree. The jury found Cassel guilty of premeditated first degree murder.

¶18 At sentencing, the State advised the trial court that Cassel had an offender score of 11, based on five felony offenses committed in Oregon in 1999 and two felonies

committed in Washington in 2000. The State did not provide certified copies of Cassel's past judgments and made no effort to compare his out-of-state convictions to similar offenses in Washington. Cassel did not object or comment on the offender score calculation, and the court sentenced him to 548 months, the high end of the standard range. This timely appeal follows.

## ANALYSIS

### OFFENDER SCORE CALCULATION

¶19 Cassel contends that the trial court erred by including Cassel's unclassified out-of-state convictions in his offender score. The State responds that the trial court's calculation is correct because Cassel failed to object at sentencing.

¶20 Illegal or erroneous sentences may be challenged for the first time on appeal. *In re Pers. Restraint of Fleming*, 129 Wn.2d 529, 532, 919 P.2d 66 (1966). It is the State, not the defendant, who bears the ultimate burden of ensuring the record supports both the existence and classification of out-of-state convictions by a preponderance of the evidence. *State v. Ford*, 137 Wn.2d 472, 480-81, 973 P.2d 452 (1999).

¶21 While the best evidence of a prior conviction is a certified copy of the judgment, the State may introduce documents of record or transcripts of prior proceedings to establish the defendant's criminal history. *State v. Cabrera*, 73 Wn. App. 165, 168, 868 P.2d 179 (1994).

¶22 Where a defendant's criminal history includes out-of-state convictions, the court must classify the convictions according to the comparable offense definitions and sentences provided in Washington law. *State v. Wiley*, 124 Wn.2d 679, 682, 880 P.2d 983 (1994).

¶23 When the court makes no effort to classify out-of-state convictions according to comparable Washington crimes before they are included in the sentencing score,

the resulting sentence is erroneous. *State v. Beals*, 100 Wn. App. 189, 196, 997 P.2d 941 (2000).

■ ¶24 When lack of classification is successfully challenged on appeal, but the defendant did not object below, we remand to the trial court to allow the State an opportunity to complete the classification process. *Ford*, 137 Wn.2d at 483.

■ ¶25 Here, the State failed to provide certified copies of Cassel's prior judgments or any comparable evidence to establish his criminal history. Further, the State made no effort to compare Cassel's Oregon convictions to Washington felonies. Instead, the State contends that Cassel acknowledged the truthfulness of his criminal history by simply failing to object at sentencing. But the State's conclusory argument is an insufficient basis for classification. And a defendant does not acknowledge the State's position regarding classification by merely failing to object at the sentencing. *Ford*, 137 Wn.2d at 483.

¶26 Because the State failed to establish the existence and comparability of Cassel's prior offenses, we remand for resentencing, allowing classification of Cassel's out-of-state convictions.

¶27 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

BRIDGEWATER and HUNT, JJ., concur.

Review denied at 156 Wn.2d 1031 (2006).